Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 1550 | DATE | 5/18/2001 |
| CASE TITLE | Victor T. Needham, Jr. vs. BI, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant BI Inc.'s motion for summary judgment (Doc. 9-1) is granted. Judgment is entered in favor of Defendant BI, Inc. and against Plaintiff Victor T. Needham, Jr.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | 2 | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | MAY 21 2001 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | 18 |
| ✓ | Mail AO 450 form. | ED-7 FILED FOR DOCKETING 01 MAY 18 PM 4:59 | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 5/18/2001 | | |
| | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | ETV | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VICTOR T. NEEDHAM, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 00 C 1550 |
| ) | |
| BI, INC., ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Victor Needham ("Plaintiff"), a forty-nine year old male, brings this action against his former employer, Defendant BI, Inc. ("BI"), alleging that he was terminated because of his sex and age in violation of Title VII, 42 U.S.C. § 2000(e), *et seq.* and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* More specifically, Plaintiff alleges that he was discharged for sexually harassing Kerry Soderstrom, a younger, female subordinate, even though he had made it clear to BI management that it was Soderstrom who had been sexually harassing him. BI now moves for summary judgment pursuant to FED. R. CIV. P. 56. For the reasons set forth below, BI's motion is granted and Plaintiff's claims are dismissed.

## FACTUAL BACKGROUND

### A. Parties

Defendant BI, headquartered in Boulder, Colorado, manufactures electronic monitoring systems for purchase by corrections agencies and also provides rehabilitation services (or Community Correctional Services ("CCS")) for former prisoners. (Hurley Aff.

¶1.) BI has approximately ninety CCS offices throughout the country, including the Chicago Day Reporting Center ("CDRC") located in the Englewood neighborhood on Chicago's South Side. (Defendant BI Inc.'s Local Rule 56.1(A) Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, ¶3; Sinclair Aff. ¶2.) At all times relevant to this case, BI employed approximately 15 individuals at the CDRC. (*Id.*) In addition to these BI employees, the CDRC staff included employees of Interventions, a subcontractor engaged by BI, who provided substance abuse counseling, as well as two or three parole officers employed by the Illinois Department of Corrections. (BI's Statement ¶4; Hurley Aff. ¶2.)

Plaintiff Needham worked at the CDRC, as Senior Case Manager and then as Assistant Program Director, from March 16, 1998 until BI terminated his employment on August 25, 1999. (BI's Statement ¶5.) During his tenure, Plaintiff supervised approximately eight BI employees, including Kerry Soderstrom, whom he supervised from her hire date of August 24, 1998 until August 4, 1999. (Needham Dep. at 27; Soderstrom Dep. at 12.) Thomas Hurley served as Director of the CDRC and Plaintiff's supervisor. (BI's Statement ¶5.) In March and April of 1999, Hurley formally evaluated Plaintiff's work performance, scoring him between "good" and "very good." (Hurley Dep., at 34-35.)

### B. Kerry Soderstrom's Sexual Harassment Complaint

Throughout Plaintiff's employment, BI had in place a sexual harassment policy which instructed BI employees to notify either their supervisor or BI's Human Resources Department in Boulder of any potential violations of the policy. (Hurley Aff. ¶5.) On

August 4, 1999, Hurley received a letter, dated July 30, 1999, from Soderstrom wherein Soderstrom chronicled a series of Plaintiff's acts which she considered to be conduct in violation of BI's sexual harassment policy. (BI's Statement, Ex. D, Dep. Ex. 13 (Letter from Soderstrom to Hurley of 7/30/99) (hereinafter "Soderstrom Letter"), at 1.) Soderstrom's letter reads, in part, as follows:

> September 1998 - April 1999 - Mr. Needham hugged me, and on certain occasions approached me from the side and began to rub his hips and genital area against me. I pushed him away and commented . . . to Mr. Needham . . . that his behavior was similar to "frotteurism." [sic]
>
> October, 1998 - I car pooled with Mr. Needham . . . The final time he drove me home, he pulled into the driveway of my residence and said, "Give me a kiss." He then tried to kiss me on the mouth. I pulled away and told him never to do that again. I then immediately exited the vehicle.
>
> February, 1999 - Mr. Needham gave me a Valentine card during work hours. The card contained a note in which Mr. Needham stated that he wanted to take me out to dinner and send me flowers during working hours, but that he did not want me to tell this to anyone.
>
> April 23, 1999 - I was in Victor Needham's office . . . [when he] said to me: "You look radiant. I can't keep my eyes off you. Do you know how hard it is to work around you when you look like that?" . . . I firmly insisted to Mr. Needham that he treat me with the respect due to a fellow professional and co-worker.

Soderstrom further alleged in this letter that, after the April 23, 1999, incident, Plaintiff used his position as Soderstrom's supervisor to retaliate against her for refusing his advances. (Soderstrom Letter, at 2.) To demonstrate such retaliation, Soderstrom provided four examples of how Plaintiff denied her the ability to "flex" her work schedule, while permitting other employees to make such adjustments. (*Id.*) In one example, occurring on July 22, 1999,

Needham required Soderstrom to work on a Friday night despite the fact that, according to Soderstrom, another employee was willing to cover her shift. (*Id.*)

## C. BI's Investigation of Soderstrom's Complaint

On August 4, 1999, the same day he received Soderstrom's complaint, Hurley set up a conference call among himself, Ann Moser (Hurley's direct supervisor), and Tracie Sinclair (CRDC's Human Resources contact in Boulder). (BI's Statement ¶ 12; Sinclair Aff. ¶ 3.) During this telephone conversation, Hurley faxed a copy of Soderstrom's letter to Moser, who passed it along to Darrell Hammond, BI's Vice President of Human Resources and Organizational Development. (Sinclair Aff. ¶ 4.) Hammond directed Sinclair to "immediately commence an investigation of Soderstrom's retaliation and harassment allegations." (*Id.*)

On August 9, 1999, from 8:45 a.m. until noon, Sinclair conducted an initial interview with Plaintiff in Boulder, where Plaintiff was attending a previously scheduled management meeting. (BI's Statement ¶ 13.) According to Sinclair's notes of this meeting, which Plaintiff reviewed and signed, Plaintiff denied verbally or sexually harassing Soderstrom, and stated that it was Soderstrom who had made sexual advances towards him. (Needham Dep., at Ex. 3.) Moreover, Plaintiff criticized Soderstrom's performance as "so inadequate that she was on the verge of termination," and characterized Soderstrom's retaliation claim as a weak attempt to cover for this poor work performance. (*Id.*)

In response to Plaintiff's allegation of Soderstrom's poor performance, Sinclair informed Plaintiff that she needed to "see all [his] documentation immediately." (Sinclair

Dep., at 49.) Three or four days later, Plaintiff produced the requested documentation. (*Id.*) In Sinclair's view, the documents should have been produced more quickly because Plaintiff only needed to pull Soderstrom's file, copy its contents, and send it to Sinclair. (*Id.*) Sinclair was further dubious of the documentation's authenticity for two reasons. First, she noted that, in violation of BI policy, none of the documents that Plaintiff submitted to her included Soderstrom's signature acknowledging that she had read and understood the document. (*Id.* at 35.) Second, Sinclair was struck by the fact that, despite her working "very closely" with Plaintiff on many employee issues in the past, Plaintiff had never previously informed her of Soderstrom's performance problems. (*Id.*) Sinclair ultimately concluded that Plaintiff had not made contemporaneous records; she testified at her deposition that the documents were "not written as time passed, but that [Plaintiff] completed it all in . . . a couple of sittings." (Sinclair Dep., at 34.)

On August 12, 1999, Sinclair interviewed Hurley. (BI's Statement, Ex. G, Dep. Ex. 6 (Summary of Sinclair's interview with Hurley of 8/12/99).). During this interview, Hurley stated that he never witnessed either Plaintiff or Soderstrom sexually harass the other. (*Id.*) He further stated that Plaintiff never reported being sexually harassed by Soderstrom. (*Id.*) After interviewing Plaintiff and Hurley, Sinclair traveled from Boulder to Chicago where, on August 16 and 17, 1999, she interviewed Soderstrom as well as eight other BI employees. (Sinclair Dep., at Ex. 9 - 15.) Sinclair freely admits that she did not interview every potential witness suggested to her by Plaintiff and Soderstrom.

Plaintiff makes much of Sinclair's failure to interview certain suggested individuals, namely Shanquinnel Bullock, Sandra Jackson, Diane Franzen, Henry Smith, Jerry Harris, and Carolyn Spencer, current and former co-workers, as well as Ann Needham, his wife. With respect to the current and former co-workers, although he offers no affidavits or depositions to bolster this claim, Plaintiff asserts that they would have stated that "[Plaintiff] never sexually harassed Kerry Soderstrom, . . . but that [they] saw her being inappropriate with men in the office." (Needham Dep., at 114-15.) Sinclair testified that she did not interview the co-workers because, according to Plaintiff's description, she believed they would only provide general knowledge of Plaintiff's character and work habits as opposed to specific information regarding the alleged conduct.

Plaintiff contends that Sinclair should have interviewed Plaintiff's wife because she would have corroborated Plaintiff's expressed discomfort with Soderstrom's practice of touching and hugging Plaintiff as well as the fact that it was actually Plaintiff who was being sexually harassed by Soderstrom. (BI's Statement, Ex. C, Dep. Ex. 8 (Letter from Ann Needham to Sinclair of 8/11/99).) Sinclair testified that she did not interview Plaintiff's wife because Plaintiff's wife had a "vested interest in the outcome of the situation," and because Mountain States Employer's Council, a Colorado management association offering guidance to employers on human resources issues, counseled against such an interview. (Sinclair Dep., at 65-66.)

Following the investigation, Sinclair determined that Soderstrom's complaint had not been lodged as a cover for her alleged poor performance and that Plaintiff had sexually

harassed Soderstrom. In addition, Sinclair concluded that Plaintiff had exhibited poor judgment in a number of areas which included: (a) showing a copy of his performance review to Soderstrom and another employee; (b) making derogatory comments about Soderstrom's Iranian roommate; (c) referring to Soderstrom's Nigerian boyfriend as a "nigger"; (d) telling Soderstrom that although he was not attracted to black women, he would consider sleeping with a black subordinate, Bridget Lee; (e) telling Soderstrom that he believed Lee had mental problems; (f) telling Soderstrom that Hurley married a black woman because Hurley likes to be in charge; and (g) singling out certain subordinates, including both Soderstrom and Lee, for intense supervision and criticism. (Sinclair Aff. ¶ 9.)

### D.  BI's Termination of Plaintiff

On August 25, 1999, after reviewing the evidence presented by Sinclair, BI terminated Plaintiff, the stated reason being his poor judgment as a supervisor. (Hurley Aff. ¶ 8; Needham Dep. at 101.) The decision to terminate was made by five people: (1) Sinclair; (2) Hurley; (3) Moser; (4) Darrell Hammond; and (5) Steve Merrifield, Sinclair's supervisor and BI's Vice President and General Manager of Community Correctional Services. (Hurley Aff. ¶ 8.) The age range of the persons making the decision was from 34 to 50 years old. (*Id.*)

### E.  Plaintiff's Complaints Regarding Kerry Soderstrom

As already mentioned, though, Plaintiff argues his termination was unfair and discriminatory because, from as early as January 1999, Hurley was on notice that Soderstrom was performing poorly and had been sexually harassing Plaintiff. With regard to her performance, Plaintiff claims he told Hurley that Soderstrom had been late in turning in her

case reports. Hurley acknowledged that Plaintiff made such a complaint. (Hurley Dep., at 50.) Plaintiff then cites various examples of Soderstrom's harassing conduct. He mentions, first, an incident in or around January 1999, when Soderstrom followed Plaintiff outside of BI's building on a cigarette break, and then pressed her body up against his. Plaintiff claims that Hurley came outside at just that moment and witnessed the incident. (Needham Dep., at 49-50.) Hurley does not recall witnessing the incident (BI's Statement, Exhibit G, Dep. Ex. 6 (Summary of Sinclair's Interview with Hurley of 8/12/99)), but does remember Plaintiff informing him later that day that Soderstrom had "rubbed up against him." (Hurley Dep., at 19.) Plaintiff then claims that, in April 1999, he informed Hurley that Soderstrom had called him three to six times at his home to discuss her relationships with particular men. (Needham Dep., at 55.) These conversations were related to Soderstrom's desire to have a relationship with a man, and not graphic depictions of Soderstrom's sexual relations with other men. (*Id.* at 56.) Nevertheless, Plaintiff believed the calls constituted sexual harassment because "[he] didn't want to hear it." (*Id.*) Finally, Plaintiff also referred to a memorandum he wrote to Hurley, dated May 31, 1999, in which he stated:

> Kerry is constantly bombarding me with requests for personal assistance. One example is that on May 12, 1999, she came into my office and asked me why a male she wanted to see had not called her when he said he would . . . On May 18, 1999 . . . she chased me out of the meeting without your approval to leave the meeting . . . and asked me to drop something for her at University (I was going to class). I hesitated and she again indignantly said, "well I could go after my hair appointment, late tonight." I told her I would drop off the check for her if it was in an addressed envelope. She went to her office, wrote the check, placed it in an envelope, and stood outside of the bathroom I was in until I opened the door, and handed it to me. Neither of these instances are

> significant breaches of the boundaries of a supervisor, but both placing me in
> a awkward position of being responsible for her personal life.

(BI's Statement, Ex. C, Dep. Ex. 9 (Memorandum from Needham to Hurley of 5/31/99).) Plaintiff acknowledges that he never specifically complained to Hurley that Soderstrom "sexually harassed" him; but argues that any reasonable person would view the May 12 and May 18 incidents as harassment of a sexual nature because Soderstrom was involving him in personal matters. (Needham Dep. at 95, 98-99.) Hurley understood the memorandum to mean, not that Plaintiff was being sexually harassed, but that he did not want Soderstrom to seek his advice as to her personal life. Therefore, Hurley informed Plaintiff to "tell [Soderstrom] to stop, you are a supervisor, direct her to do so." (Hurley Dep., at 61.)

## DISCUSSION

Summary judgment is appropriate only when "the pleading, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is not genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). *See also Flores v. Preferred Technical Group*, 182 F.3d 512, 514 (7th Cir. 1999). In determining the existence of genuine issues of material fact, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Flores*, 182 F.3d at 514. If the nonmoving party bears the burden of proof on any issue, he must offer sufficient evidence to show the existence of each element of his case, and cannot rest on the pleadings alone to defeat a motion for summary judgment. *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 395 (7th Cir. 1999).

As noted at the outset, Plaintiff brought his complaint in this case pursuant to Title VII and the ADEA. Title VII makes it unlawful for an employer to terminate an employee because of his sex, 42 U.S.C. § 2000e-2(a)(1), and the ADEA makes it unlawful for an employer to terminate an employee because of his age, 29 U.S.C. § 623(a). *See O'Regan v. Arbitration Forums, Inc.*, –F.3d–, Nos. 99-4044, 00-1306, 2001 WL 357483 (7th Cir. Apr. 9, 2001). Because Plaintiff has not presented direct evidence of discrimination, his Title VII and ADEA claims proceed under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* First, Plaintiff must make a prima facie case of discrimination by demonstrating that: (1) he was a member of a protected class; (2) he was performing according to BI's legitimate expectations; (3) he was discharged; and (4) other, similarly situated employees who were not members of the protected class were treated more favorably. *Id.* (citing *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000); *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998)). If Plaintiff establishes a prima facie case, BI must then produce a legitimate, nondiscriminatory reason for his termination. *O'Regan* (citing *Paluck*, 221 F.3d at 1009). Then, in order for Plaintiff to prevail, he must rebut BI's legitimate reason by presenting evidence that could enable the trier of fact to find that BI's reason is merely pretext for discrimination. *Id.*

## A.  Plaintiff's Failure to Establish a Prima Facie Case

BI contends that Plaintiff's claims must both fail because Plaintiff has not satisfied the second or fourth prongs of his prima facie case–i.e., BI argues that Plaintiff did not meet its legitimate expectations and did not present the court with a similarly situated younger and/or

female BI employee who was treated more favorably than Plaintiff. BI argues that Plaintiff did not meet its legitimate expectations because, as it concluded after an investigation, Plaintiff sexually harassed a subordinate. The court disagrees. As Judge Suzanne Conlon wrote in *Williams v. General Mills, Inc.*, 926 F. Supp. 1367, 1377 (N.D. Ill. 1996), "[s]imply because the company honestly believes that [the plaintiff] sexually harassed female employees does not mean that [the plaintiff] did not receive adequate performance evaluations concerning his job duties." Here, Plaintiff provided the court with a positive work performance evaluation for April and May of 1999. BI has not challenged the authenticity of this evaluation, nor has BI suggested that Plaintiff's work performance worsened after that point in time. The court, therefore, finds that Plaintiff has satisfied the second prong of his prima facie case.

The court nevertheless agrees with BI that Plaintiff has failed to satisfy the fourth prong on his prima facie case. In his attempt to do so, Plaintiff claims, for purposes of both his sex and age discrimination claim, that Soderstrom was similarly situated and treated more favorably than him because she was accused, by Plaintiff himself, of sexual harassment, but, unlike Plaintiff, was not terminated. BI argues that Soderstrom is not similarly situated to Plaintiff because (a) she was Plaintiff's subordinate and (b) she complained of multiple incidents of sexual harassment whereas Plaintiff, at most, complained that Soderstrom was a poor performer and an annoyance.

The mere fact that Soderstrom was Plaintiff's subordinate may not by itself defeat Plaintiff's claim that she was similarly situated to him. In support of its argument on this

issue, BI cites *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993), but that case does not control the circumstances before this court. *Sarsha* involved a male supervisor who was terminated for violating the employer's unwritten rule against supervisors dating their subordinates. The female subordinate was not terminated. The Seventh Circuit noted that "Sears is entitled to enforce a no-dating policy (if one exists) against supervisors, who by virtue of their managerial positions are expected to know better, rather than subordinates." *Id.* at 1042. Here, however, BI does not argue that its sexual harassment policy is only directed at, or enforced against, the conduct of supervisors as opposed to subordinates. In fact, BI's sexual harassment policy states: "Any employee or supervisor who violates this policy will be subject to discipline up to and including discharge."

A statement in a recent Seventh Circuit case, while dicta, is arguably more relevant here. In *Freeman v. Madison Metropolitan Sch. Dist.*, 231 F.3d 374, 383 (7th Cir. 2000) (citing *Morrow*, 152 F.3d at 561), the Seventh Circuit noted that "where a male employee fired for sexual harassment claimed that women who engaged in similar conduct were not terminated, 'similarly situated' would not necessarily be those who held the same job that he held, but rather would be those female employees who had been the subject of comparable complaints of sexual harassment." *See also Morrow*, 152 F.3d at 561 ("The plaintiff has the burden of showing that similarly-situated female employees–that is, female employees who had been the subject of comparable complaints of sexual harassment–were treated more favorably than [him].").

The court turns, then, to the question of whether Soderstrom's complaints to Hurley were comparable to Plaintiff's. The court is convinced that they were not. In Soderstrom's July 30, 1999 complaint, she alleges that Plaintiff (a) hugged her, and on certain occasions, rubbed his hips and genital area against her; (b) told her to "give [him] a kiss" and then tried to kiss her on the mouth; and (c) told her he couldn't keep his eyes off her. Plaintiff's complaints to Hurley, on the other hand, primarily concerned Soderstrom's work performance and desire to discuss her personal life with him. In fact, Plaintiff admitted that he never informed Hurley that he was claiming to have been sexually harassed. In *Morrow*, the court made a similar distinction between two individuals' complaints. *Morrow* involved two male Wal-Mart employees, terminated for sexually harassing co-workers, who claimed that three female employees had engaged in similar acts of sexual harassment, but were not terminated. *Id.* at 560-61. One of the male employees, during the sexual harassment investigation against him, informed management that his accuser had made crude comments to him with sexual connotations. The court accepted Wal-Mart's argument, similar to BI's here, that the female employee was not terminated because the male employee's statement did not constitute a complaint of sexual harassment. The Seventh Circuit stated that "although some of Wal-Mart's female employees seem to have engaged in questionable behavior, there is no evidence that any of this behavior sparked complaints of harassment like those that Wal-Mart received concerning Thalacker and Morrow." *Id.* at 564.

Although, as explained earlier, Soderstrom's status as Plaintiff's own subordinate may not preclude a finding that she was similarly situated to him, that status is relevant to this

second question, of whether her alleged misconduct was comparable to his. If her behavior was in fact troublesome to him, as Plaintiff now suggests, he has no explanation for his own failure to take appropriate disciplinary action. For this reason, and because of the absence of specific facts showing that Hurley, or any other member of BI management, received a sexual harassment complaint from Plaintiff, Plaintiff fails to establish that Soderstrom was similarly situated to him.

B.    **Plaintiff's Failure to Establish Pretext**

Assuming, *arguendo*, that Plaintiff was able to demonstrate a prima facie case of sex or age discrimination, his claims would nevertheless fail. BI has proffered a legitimate nondiscriminatory reason for Plaintiff's discharge–his sexual harassment of Soderstrom. According to the *McDonnell Douglas* burden-shifting analysis outlined above, Plaintiff must then demonstrate that BI's reason is pretextual. In order to demonstrate pretext, Plaintiff must show that BI's reason either: "(1) has no basis in fact; (2) did not actually motivate her discharge; or (3) was insufficient to motivate her discharge." *Velasco v. Illinois Dept. of Human Servs.*, –F.3d–, No. 00-1391, 2001 WL 361006 (7th Cir. Apr. 12, 2001).

Plaintiff essentially argues that the investigation into his conduct was tainted, and therefore had no basis in fact, because Hurley, to whom Plaintiff had complained on multiple occasions, did not inform Sinclair of such prior complaints during his August 12, 1999 interview. The argument raised here by Plaintiff is strikingly similar to that raised recently by the plaintiff in *Mellinger v. Combined Ins. Co. of America*, No. 99 C 4530, 2001 WL 185183 (N.D. Ill. Feb. 26, 2001). In *Mellinger*, the plaintiff, a male who was terminated for sexually

- 14 -

harassing a female subordinate, claimed that, during the investigation into his conduct, his employer ignored evidence that the subordinate had actually been harassing him. The court found that the investigator's failure to "d[ig] deeper" into the plaintiff's allegations concerning his accuser's conduct did not indicate that her investigation was tainted by any improper motive. *See id.* at *9. The court noted that, more importantly, "it is well established that whether an employer's decision was *right* does not matter in a Title VII intentional discrimination claim." *Id.* (citing *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999)).

Here, BI ultimately came to a decision based on Sinclair's comprehensive investigation. Sinclair did not interview Hurley alone; she interviewed Plaintiff, Soderstrom, Hurley, and eight other BI employees. The court is not willing to play micro-manager and decide whether Sinclair asked all the right questions and interviewed all the right people. *See Perez v. Rexnord, Inc.*, No. 96 C 3514, 1998 WL 526571, at *6 (N.D. Ill. Aug. 17, 1998) ("Rexnord conducted a thorough investigation into Munoz' complaints and concluded that Munoz' complaints against Perez were more serious than the complaints lodged by Munoz against Rankin."). The court does not deny that Plaintiff raised some concerns before Hurley and it may be that Hurley should have mentioned these complaints to Sinclair. But there is absolutely no evidence in the record that Hurley did not offer Sinclair his true perception of the Plaintiff-Soderstrom relationship. Sinclair, after all of the interviews were complete, drew her conclusions. The court does not doubt that she honestly believed these conclusions to

be true, and therefore finds that BI's reason for terminating Plaintiff was not a pretext for either sex or age discrimination.

## CONCLUSION

For the foregoing reasons, Defendant BI Inc.'s motion for summary judgment (Doc. 9-1) is granted.

ENTER:

Dated: May 18, 2001

REBECCA R. PALLMEYER
United States District Judge